UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| ASHLEE GONZALEZ, individually and as | § | |
| dependent administrator of and on behalf of | § | |
| the ESTATE OF MELISSA DE LA CRUZ, | § | |
| and MELISSA DE LA CRUZ's heir(s)-at-law | § | |
| and wrongful death beneficiaries; and | § | |
| ARACELI DE LA CRUZ, individually, | § | CIVIL ACTION NO. |
| | § | |
| Plaintiffs, | § | JURY DEMANDED |
| | § | |
| v. | § | |
| | § | |
| HIDALGO COUNTY, TEXAS, | § | |
| | § | |
| Defendant. | § | |
| | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

> **Deathly ill pretrial detainee Melissa De La Cruz horribly suffered while incarcerated in the Hidalgo County jail and in the hospital afterward, and died, due to Hidalgo County policies, practices, and customs.**



## Table of Contents

I.    Introductory Allegations .................................................................................3

    A.    Parties..................................................................................................3

    B.    Jurisdiction and Venue........................................................................4

II.   Factual Allegations .........................................................................................5

    A.    Preliminary Statements .......................................................................5

    B.    Melissa's Suffering and Death in the Hidalgo County Jail................6

        1.    General Timeline .......................................................................6

        2.    Custodial Death Report (Filed with Attorney General).....................8

        3.    Inmate Death Report (Filed with TCJS) .............................................8

        4.    Medical Records .......................................................................9

            a.    EMS Records .................................................................9

            b.    Hospital Records............................................................9

            c.    Death Certificate and Cause of Death....................................18

    C.    Liability of Hidalgo County................................................................18

        1.    Introduction ............................................................................18

        2.    Suffering and Deaths of Other Detainees Pointing to County Policies, Practices, and Customs that Fail to Protect Detainees ..........19

        3.    TCJS Inspections and Non-Compliance Notices Demonstrate Hidalgo County's Unconstitutional Policies, Practices, and Customs..25

        4.    Hidalgo County Policies, Practices, and Customs ...............................29

III.  Causes of Action ...........................................................................................33

    A.    Remedies for Violation of Constitutional Rights...........................................33

    B.    Cause of Action Against Hidalgo County Under 42 U.S.C. § 1983 for Violation of Constitutional Rights .................................................34

IV.   Concluding Allegations and Prayer ..............................................................37

    A.    Conditions Precedent ..........................................................................37

    B.    Use of Documents at Trial or Pretrial Proceedings .........................37

    C.    Jury Demand .......................................................................................37

    D.    Prayer ..................................................................................................37

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiffs file this complaint and for cause of action will show the following.

I.        Introductory Allegations

A.        Parties

1.        Plaintiff Ashlee Gonzalez ("Ms. Gonzalez") sues in her individual capacity and as the dependent administrator of the Estate of Melissa De La Cruz, Deceased. Melissa De La Cruz is referred to at times in this pleading as "Melissa" and the "decedent."  Ms. Gonzalez is the biological and legal daughter of Melissa De La Cruz. Ms. Gonzalez, when asserting claims in her individual capacity, seeks all damages and remedies available to her as a wrongful death beneficiary and/or heir. Ms. Gonzalez, when asserting claims in this lawsuit as the dependent administrator, does so in that capacity on behalf of all wrongful death beneficiaries (including herself, Araceli De La Cruz [the decedent's daughter], minor female #1 A.V. [the decedent's daughter], and minor female #2 A.V. [the decedent's daughter]) (the "Wrongful Death Beneficiaries"). Ms. Gonzalez asserts claims on behalf of and seeks all wrongful death and other damages available under law to the Wrongful Death Beneficiaries. Ms. Gonzalez also sues in that capacity asserting claims on behalf of the estate and all of Ms. De La Cruz's heirs (currently Ms. Gonzalez, Araceli De La Cruz, minor female #1 A.V., and minor female #2 A.V.) (the "Claimant Heirs"). Ms. Gonzalez asserts claims on behalf of and seeks all survival and other damages available under law to the Claimant Heirs. Ms. Gonzalez qualified and had letters issued as dependent administrator in Cause Number 2023-PR-00539-2, in the County Court at Law No. 2 of Nueces County, Texas, in a case styled *Estate of Melissa De La Cruz, Deceased.*

2.        Plaintiff Araceli De La Cruz is the biological and legal daughter of Melissa De La Cruz. Araceli De La Cruz sues in her individual capacity and seeks all damages and remedies available to her as a wrongful death beneficiary and/or heir.

3.     Defendant Hidalgo County, Texas ("Hidalgo County" or "the County") is a Texas county that may be served with process pursuant to Federal Rule of Civil Procedure 4(j)(2) by serving its chief executive officer, Honorable County Judge Richard F. Cortez, at 100 E. Cano Second Floor, Edinburg, Texas 78539, or wherever Honorable County Judge Richard F. Cortez may be found. Service on such person is also consistent with the manner prescribed by Texas law for serving a summons or like process on a county as a Defendant, as set forth in Texas Civil Practice and Remedies Code Section 17.024(a). The County acted or failed to act at all relevant times through its sheriff, jail administrator(s), employees, agents, representatives, jailers, and/or chief policymakers, all of whom acted under color of state law at all relevant times, and it is liable for such actions or failures to act to the extent allowed by law (including but not necessarily limited to law applicable to constitutional violation claims pursuant to 42 U.S.C. § 1983). The County's policies, practices, and customs were moving forces behind and caused, were proximate causes of, and were producing causes of constitutional violations and resulting damages (including suffering and death) referenced in this pleading.

B.     Jurisdiction and Venue

4.     The court has original subject matter jurisdiction over this lawsuit according to 28 U.S.C. §§ 1331 and 1343(4), because this suit presents a federal question and seeks relief pursuant to federal statute(s) providing for the protection of civil rights. This suit arises under the United States Constitution and 42 U.S.C. § 1983. The court has personal jurisdiction over the County because it is a Texas county. Venue is proper in the McAllen Division of the United States District Court for the Southern District of Texas, pursuant to 28 U.S.C. § 1391(b)(2). A substantial part of the events or omissions giving rise to the claims in this lawsuit occurred in Hidalgo County, which is in the McAllen Division of the Southern District of Texas.

II.    Factual Allegations

    A.    Preliminary Statements

    5.    This is a constitutional rights case. As discussed in further detail below, Hidalgo County has a constitutional duty to provide reasonable and necessary medical and mental healthcare to pretrial detainees being held in Hidalgo County jail, to protect such detainees, and not to punish them. Hidalgo County violated Melissa's constitutional rights when it implemented policies, practices, and customs that withheld reasonable and necessary medical care from Melissa, failed to protect her, punished her, and which were a moving force behind her suffering (in the jail and hospital) and death.

    6.    Plaintiffs provide below the general substance of certain factual allegations. Plaintiffs do not intend that those sections provide in detail, or necessarily in chronological order, any or all allegations. Rather, Plaintiffs intend that those sections provide Defendant sufficient fair notice of the general nature and substance of Plaintiffs' allegations and further demonstrate that Plaintiffs' claims have facial plausibility. Moreover, where Plaintiffs quote a document, conversation, or recording verbatim, or provide a person's name, Plaintiffs have done their best to do so accurately and without any typographical errors. However, some typographical errors may still exist. Moreover, as to names of natural people, some names may inadvertently be spelled phonetically.

    7.    Plaintiffs plead facts which give rise to and thus assert conditions of confinement claims. Conditions of confinement claims require no deliberate indifference on behalf of a governmental entity or governmental actor. In the alternative, Plaintiffs plead facts which give rise to episodic acts or omissions claims. Regardless, pursuant to United States Supreme Court authority, Plaintiffs need not assert in this pleading specific constitutional guarantees or claims but

rather must merely plead facts which give rise to constitutional claims. Plaintiffs thus ask the court to apply the correct legal theories to the facts pled.

8.      Plaintiffs will only be able to plead their best case after conducting discovery. It is exceedingly rare that a Plaintiff will have access to or knowledge of specific details regarding the existence or absence of a Defendant's internal policies or training procedures before discovery. Plaintiffs intend to amend this pleading as further facts are developed or in the event any court determines that Plaintiffs' live pleading is any manner deficient.

      B.        <u>Melissa's Suffering and Death in the Hidalgo County Jail</u>

           1.       <u>General Timeline</u>

9.      Melissa was arrested as a pretrial detainee, incarcerated in the Nueces County jail, and then transferred to the Hidalgo County jail. A completed Texas Uniform Health Status Update form, dated March 10, 2023, required when custody of a person is transferred between two Texas law enforcement agencies, indicated that Melissa had diabetes, arthritis, and chronic back and neck issues.  Melissa was booked into the Hidalgo County Jail on March 10, 2023.

10.     The jail learned that Melissa had high blood pressure and suffered from depression and anxiety. Melissa was put on a regular diet and housed in the jail's general population.  There were also indications that Melissa may have suffered from mental illness. Records leading up to Melissa's ultimate and unfortunately too-late transport to the hospital are sparse regarding what occurred related to Melissa's physical issues.

11.     On April 10, 2023, Melissa was crying when she sought medical treatment due to having pain when merely breathing. During an April 10, 2023 phone call with her daughter, Melissa said that she had been having strong chest pains, and her legs were hurting. She indicated that she told one or more jailers, and one or more jailers contacted the medical department.  No

one would answer at the jail's medical department. Melissa's daughter indicated that she would call the jail about Melissa's serious pain.

12.     On April 11, 2023, Melissa said during a phone call, "I still feel like sh*t, but my body hurts."  Her pain from a life-threatening illness continued.

13.     On April 12, 2023, instead of providing treatment for Melissa's serious pain from physical issues which would soon result in her death, jail medical personnel apparently jokingly blamed Melissa's issues on allegedly eating Hot Cheetos, Takis, and pickles. Melissa had been found on the floor, apparently cursing and yelling due to the extreme pain level.

14.     On April 12, 2023, Melissa, when responding to a by her daughter Audra during a phone call about how she was feeling, said, "Like sh*t." Melissa's daughter said that she had already called the jail about her mother's serious medical condition, and that jail employees would "transfer [her] everywhere." Melissa asked her daughter whether she had put money on her jail account so that Melissa could buy her own medication and take it when she felt like she needed it. This was presumably because the jail was not providing sufficient medication to control Melissa's pain. Melissa's daughter asked her whether she had talked to a jailer, and Melissa said, "No. They don't give any help . . . ." Melissa also said, "I haven't been able to keep nothing down. I'm throwing everything up." Melissa's daughter offered to call the jail again to get Melissa the help she needed, but that she had apparently ended a phone call with the jail only about 20 minutes before.

15.     During an April 12, 2023, phone call, Melissa said, "I was fu**ing sick all night. I had to fu**ing throw myself on the floor so they could fu**ing come get me." Melissa said that she had an "ugly pain... like bad." She said that "it fu**ing hurts." She further said, "It's an ugly pain, yeah." She said that it was in the middle of her stomach and went all the way to her back.

Melissa indicated that she needed to do something to get out of the jail due to the "big big" pain she was suffering.

16.    Melissa likely told more than one person in the jail regarding her significant suffering, yet employees consistently did not transported her to an emergency room. Melissa even said, when asked about any leg pain, that her leg didn't even hurt. She seemed to indicate that she had pain like she had never had before. This may have been the last jail phone call in which Melissa participated due to her increasing pain and suffering and unfortunate death just a few days later.

17.    On April 13, 2023, Melissa was seen in the medical department for right upper quadrant pain, which Melissa appeared to be guarding, and rebound pain. Melissa was pale, hypotensive, and tachycardic. It was only then that someone decided to send Melissa to a hospital for medical treatment. Unfortunately, Melissa's vitals indicated in part that it was too late for her to receive life-saving medical treatment, her blood pressure being only 90/60 and her pulse being 110. This was likely due to serious infection raging in her body, untreated for several painful days.

2.    Custodial Death Report (Filed with Attorney General)

18.    It appears that the Hidalgo County Sheriff's Department failed to file a custodial death report with the Attorney General of Texas.  It is common practice for jails to "dump" seriously ill detainees on a hospital and discharge them from custody to avoid paying for medical expenses and having to report the death to authorities.

3.    Inmate Death Report (Filed with TCJS)

19.    It appears that the Hidalgo County Sheriff's Department also failed to file an inmate death report with the Texas Commission on Jail Standards.  This too was likely a result of the common practice of jails "dumping" seriously ill detainees on hospitals and discharging them from custody to avoid paying for medical expenses and having to report the death to the state.

    4.      Medical Records

        a.      EMS Records

20.      There appear to be no EMS records for Melissa's transfer from the Hidalgo County jail to the Edinburg Regional Medical Center hospital.  Instead of calling an ambulance, which would have medical personnel who could assist, it appears that the sheriff's department chose to drive Melissa to the hospital in an apparent county vehicle.  This was a misguided attempt to save money.

        b.      Hospital Records

21.      Edinburg Regional Medical Center records describe the pain, suffering, and surgery Melissa underwent in the final days of her life.  On April 13, 2023, at 2:04 p.m., Melissa was examined by Jean Joseph, M.D., Ryan Silvera, M.D., and Walter Valdez, RN for complaints of right upper quadrant abdominal pain. She rated the pain level as 10/10. She also stated that her complaints are associated with nausea/vomiting for three days.  Melissa said that the pain was rated at 7/10 two days prior, but that morning, it intensified to 10/10, radiating to her back.  Plaintiffs contend that this information was well-known in the jail, and jail employees acted consistently in failing to secure emergency medical treatment.

22.      The onset of her symptoms began days before, and the course and duration of the symptoms were constant and worsening. The character of the symptoms was sharp, with a moderate degree of pain at onset (7/10) and severe pain at the present time was 10/10. The location of the pain at onset was in the right upper abdominal area, and it currently radiated to the right side of her back. The exacerbating factor was movement, and there were no relieving factors. On examination, she was in severe distress and anxious. Gastrointestinal examination showed severe

guarding. Her lab values at 10:19 p.m. were found to be high for white blood cells and low for HCT.  Orders were placed for Melissa to have nothing by mouth (NPO).

23.    Lab studies were ordered, and a saline lock was inserted. Melissa received toradol, morphine, and zofran intravenously and pepcid orally. A nonmobile gallstone was noted within the lumen of the gallbladder, along with gallbladder distention, mild gallbladder wall prominence, and a suggestion of minimal pericholecystic fluid.

24.    The CT of the abdomen/pelvis showed the suggestion of mild bilateral pulmonary atelectasis/fibrosis of the included inferior portions of the lungs. A 1.5 cm calcified gallstone near the neck of the gallbladder was seen. The appearance of prominence of portions of the gastric walls was at least partly related to the degree of distention of the stomach. Evaluation of the stomach was limited, with the stomach not well distended. She was diagnosed with regular sinus tachycardia, leukocytosis, gallstone, and acute sepsis. Thus, Plaintiffs contend, Melissa had suffered with untreated sepsis in the jail.

25.    On the same day, April 13, 2023, at 5:41 p.m., Melissa was examined for complaints of abdominal pain. She had presented with abdominal pain and flank pain. The course and duration of Melissa's symptoms had been constant and worsening. The character of the symptoms had been described as achy and crampy. The degree of pain at onset had been severe, and the location of the pain at that time had been both abdominal and flank. The pain had radiated from the abdomen. The relieving factor had been vomiting. She stated that her symptoms had been associated with nausea, vomiting, and back pain.

26.    On April 14, 2023, at 7:14 a.m., Melissa was seen by Theodore Pettle, M.D. and Anyssa Perez, PA-C for gastroenterology consultation for cholelithiasis. She stated that her

abdominal pain was located in the right upper quadrant and radiated to her back. She also reported associated nausea and vomiting. A right upper quadrant ultrasound showed gallbladder distention, cholelithiasis, gallbladder wall prominence, minimal pericholecystic fluid, and a positive sonographic Murphy's sign, which could be clinically correlated with possible cholecystitis. A CT scan of the abdomen and pelvis showed findings suspicious for cholecystitis and cholelithiasis. She had a low-grade fever the previous night as well. She continued to experience severe right upper quadrant pain. Surgery had been consulted, pending evaluation. She had cholelithiasis. The right upper quadrant ultrasound revealed gallbladder distention, cholelithiasis, gallbladder wall prominence, minimal pericholecystic fluid, and a positive sonographic Murphy's sign, which could be clinically correlated with possible cholecystitis. The CT scan of the abdomen and pelvis showed findings suspicious for cholecystitis and cholelithiasis. Surgery was consulted for a possible cholecystectomy, pending evaluation. The GI service would continue to follow.

27.      On the same day at 9:25 a.m., Melissa was examined by Dr. Pettle for complaints of right upper quadrant pain with nausea and vomiting for three days. She rated the pain level as 7/10. The results of the lab studies were positive for Hepatitis C. She was diagnosed with right upper quadrant abdominal pain. Dr. Pettle reported that she had a low to moderate probability of choledocholithiasis. She was pending laparoscopic cholecystectomy with intraoperative cholangiogram. At 9:46 a.m., Melissa was examined by Ryan Silvera, M.D. for complaints of abdominal pain. Records indicate that Melissa was diagnosed with severe sepsis without septic shock. Based on evidence within the medical record, Melissa was being treated for severe sepsis according to SIRS criteria. At 1:04 p.m., Melissa underwent laparoscopic cholecystectomy surgery. Her pre- and post-operative diagnoses were acute cholecystitis, cholelithiasis, and sepsis. The gallbladder was nearly perforated and gangrenous.

28.    On April 15, 2023, at 6:45 p.m., Melissa was seen and examined by Dr. Saggi and Amparo Belo, NP. She was seen post-operative day one following laparoscopic cholecystectomy with gangrenous gallbladder. She had complaints of abdominal pain. She was diagnosed with status post laparoscopic cholecystectomy. There was massive hepatomegaly with a buttery soft fatty liver and a gangrenous, nearly perforated gallbladder. No drain was used due to oozing from the liver bed and concerns about creating more bleeding with a drain. Multiple Nu-Knit and Floseal were applied to control the oozing from the liver bed, which became hemostatic at the end of the case after holding direct pressure for 10 minutes. On postoperative day 1, her WBC count was 14.6, trending down from 20.9. The pain was somewhat uncontrolled, but she tolerated a liquid diet and had been passing gas. The plan was to advance her diet to a GI soft diet that day, and she was encouraged to get out of bed and ambulate. Pain management was continued, and labs were scheduled to be repeated in the morning. IV antibiotics were to be continued for another 24 hours, and general surgery would be following her case.

29.    On April 16, 2023 at 5:30 p.m., Melissa was seen and examined by Dr. Saggi, and Ms. Belo for complaints of abdominal pain. She was postoperative following the laparoscopic cholecystectomy for a gangrenous gallbladder. Melissa still required intravenous medications for pain.

30.    On April 17, 2023 at 8:32 a.m., the rapid response team responded to Melissa for altered mental status. The team arrived at 08:35 a.m. to assess the situation. There was an acute change in her mental state, a notable change in systolic blood pressure from baseline, and a failure to respond to treatment. Given her condition, the disposition was upgraded to the intensive care unit/critical care unit for closer monitoring and management. A CT of Melissa's head was obtained for altered awareness. The study showed that there was no acute intracranial abnormality.

31.     On the same day at 09:27 a.m., Melissa was examined by Dr. Ortiz and Aldrich Balanak, NP, for complaints of abdominal pain and abdominal distension. Her abdomen was distended, firm to the touch, and exhibited tenderness on palpation. She also had a Foley catheter in place, with no reported urine output. She reported that she had not had a bowel movement and was unable to pass gas since the surgery. She rated the pain level as 9/10. The Foley catheter remained in place for urinary monitoring. Melissa was deemed critically ill with a guarded prognosis and was to remain in the intensive care unit for further care.

32.     On April 18, 2023, at 07:26 a.m., Melissa was examined by cardiologist Dr. Ortiz. She was evaluated in the ICU. She was found to be critically ill and her prognosis was guarded. A plan was made to keep her in the ICU.  On the same day, at 07:56 a.m., Melissa was examined by gastroenterologist Anyssa Perez, P.A., and Dr. Pettle for persistent pain in her right upper quadrant of the abdomen.

33.     On April 19, 2023, at 09:10 a.m., Melissa was examined by nephrologist Mark Liong, M.D. for complaints of pain in her abdomen. She was on pain medications in the ICU. The nephrologist was asked to make further recommendations for her acute renal failure. On examination, she had tenderness in the abdomen and the drain was noted to be in place. She appeared drowsy due to pain medications. She was diagnosed with acute kidney injury secondary to acute tubular necrosis multifactorial from severe hemodynamic instability with systolic blood pressure. Anuria and worsening renal function were discussed with her. She was recommended initiation of renal replacement therapy as she had not responded to the volume challenge. She agreed to proceed with dialysis. Her prognosis was guarded. The plan was discussed with the critical care team.

34.     On the same day, at 10:08 a.m., Melissa presented to Dr. Ortiz for dialysis line insertion for hemodialysis. She underwent the insertion of a trialysis catheter for worsening renal failure.  On the same day, at 11:09 a.m., an X-ray of Melissa's chest was obtained. The study revealed incomplete expansion of the lungs, moderate pulmonary edema and cardiomegaly, probable bilateral pleural effusions, atherosclerosis, and a left internal jugular (IJ) dialysis catheter in a good position. At 06:26 p.m., Melissa was examined by the general surgery team Dr. Saggi, and Amparo Belo, N.P., in the ICU for sepsis and pain in the abdomen. She appeared drowsy and sedated however aroused and followed the commands. On examination, she had distended and tenderness over her abdomen. She was administered 2 liters of oxygen through a nasal cannula. A right percutaneous drain was noted to be in place. She was in ICU due to Sepsis with septic shock and required vasopressor.

35.     On April 20, 2023, at 07:13 a.m., Melissa was examined by gastroenterologist Ingrid Chacon, M.D. Her condition was stable. She was tolerating a liquid diet. She was diagnosed with abdominal pain of the right upper quadrant, acute sepsis, gallstone, leukocytosis, and regular sinus tachycardia. On the same day, at 07:38 a.m., Melissa was examined by cardiologist Dr. Ortiz. She was found to be critically ill and her prognosis was guarded. A plan was made to keep her in the ICU. At 11:42 a.m., Melissa had a physical therapy session with Larah Alexander, D.P.T. She reported pain in her abdomen and rated her pain level as 8/10. On examination, she appeared anxious and had a decreased active range of motion and strength in the bilateral lower extremities. She reported that she had received oxygen therapy on a needed basis for shortness of breath, dyspnea, and chest pain. She reported that previously she was functionally independent with Activities of daily living (ADLs) /transfers/mobility. Bed mobility and transfers required maximal to total assistance. Sitting balance was impaired, with fatigue limiting endurance. Her PT

impairment or limitations were ambulation deficits, balance deficits, bed mobility deficits, endurance deficits, equipment training, pain limiting function, strength deficits, transfer deficits, and transition deficits.

36.     On April 21, 2023, at 10:07 a.m., Melissa was examined by general surgeon Dr. Saggi. She remained in the ICU due to sepsis. She was seen while undergoing dialysis and was evaluated in the presence of Dr. Saggi. On the same day, at 01:38 p.m., Melissa was examined by the cardiology team Dr. Ortiz, and Aldrich Balanak, FNP-C, ACNPC-AG., AGACNP-BC. She reported that she was not feeling well but did not have specific symptoms. She complained of abdominal pain without vomiting or diarrhea. Due to worsening renal function and an oligomeric state, she was deemed to require continued hemodialysis. On physical exam, the abdomen was distended, firm, tympanic, and had hypoactive bowel sounds with staples intact. She rated her pain level as 8/10. She was diagnosed with acute renal failure with acute tubular necrosis, and improved respiratory failure following extubation.

37.     On the same day, at 10:32 p.m., Melissa was examined by Hung Tran, M.D., Dr. Melendez, Alexis Saenz, R.N., Ruben Rivera, L.V.N., Danico Maria, Crisafa Sikuntes, Arantxa Zavala, and Karina Alonzo due to code blue. A code blue was called due to cardiopulmonary arrest. Her heart rate had dropped to 25 bpm before becoming unresponsive. Cardiopulmonary resuscitation (CPR) was initiated at 10:33 p.m., and Advanced Cardiovascular Life Support (ACLS) began at 10:35 p.m. She was intubated at 10:40 p.m. Dr. Tran spoke with Melissa's daughter, Ashlee, at 10:54 p.m., and later consulted with hospitalist Dr. Melendez and intensivist Dr. Thopu. She regained a pulse at 10:52 p.m., and her blood pressure was recorded at 111/91 mmHg by 11:03 p.m. Endotracheal intubation was performed for cardiac arrest. She was stable and was transitioned to the ICU under the care of Dr. Thopu.

38.     On April 22, 2023, at 12:13 a.m., Melissa had a pulmonary critical care consultation with Dr. Thopu. Dr. Thopu confirmed that her prognosis was poor due to multiorgan failure, severe hypoalbuminemia, and the need for ongoing critical care intervention. The physician further mentioned that Melissa was critically ill, requiring continuous monitoring and treatment in the intensive care unit to prevent morbidity, mortality, and loss of organ function. Her risk of Morbidity/Mortality and the Complexity of Medical decision-making were high.  On the same day, at 01:27 a.m., Melissa was examined by pulmonologist Dr. Thopu. Dr. Thopu contacted Ashlee and provided an update regarding Melissa's cardiac arrest, stating that her condition was critical. Ashley informed Dr. Thopu that Melissa's sisters and additional family members were arriving from Corpus Christi to visit her. The family was informed that Melissa remained full code at that time. On the same day, at 06:07 a.m., an X-ray of Melissa's chest was obtained for nasal gastric tube placement. The study revealed nasogastric tube was in the stomach.

39.     On the same day, at 07:27 a.m., Melissa was examined by the cardiology team Dr. Ortiz, and Aldrich Balanak, FNP-C, ACNPC-AG., AGACNP-BC. She was found to be intubated, sedated, and mechanically ventilated after a cardiac event at 10:33 p.m., the prior night, during which she was unresponsive, bradycardic, and entered pulseless electrical activity. On examination, her abdomen was distended. She was diagnosed with acute hypoxemic respiratory failure requiring intubation, metabolic acidosis, septic shock anemia, anemia elevated AST and ALT, hyperkalemia, and suspected pulmonary embolism. Her daughter was informed that Melissa's condition was critical and there was a chance that Melissa could pass away. The Do Not Resuscitate (DNR) status was discussed and the decision of DNR was made in consultation with her daughter.

40.     On the same day, at 10:19 a.m., Melissa was examined by the nephrology team Roberto Manllo-Karim, M.D., and Ninfa Perez, P.A. The family, present at the bedside, was made aware of the renal treatment plan and informed of her poor prognosis.  On the same day, at 12:08 p.m., Melissa was examined by the general surgeon team Dr. Saggi, and Emily Adams, A.N.P. At the time of assessment, she was on five pressors, remained unstable for any further CT imaging of the chest, abdomen, or pelvis, and was listed as do not resuscitate. According to the nurse, she was neurologically unresponsive with no measurable blood pressure, or heart rate in the 80s, and remained intubated with ventilator support. Mottling of extremities was noted, and a Foley catheter was present. She was diagnosed with acute sepsis, gallstones, leukocytosis, and regular sinus tachycardia. No drain placement due to concerns of exacerbating bleeding. Due to her critical status and instability, she remained a poor candidate for imaging, and the recommendation was to continue care under the ICU team's supervision.

41.     On the same day, at 02:40 p.m., Melissa was examined by internal medicine specialist Dr. Melendez. Her family was informed of her condition. After discussion with Melissa, and her family, a request was made for withdrawal of care. The care team reaffirmed the plan to proceed with the withdrawal of care in line with Melissa and her family's wishes. Extensive discussions took place with both the family and the intensivist. The family agreed to a DNR status and withdrawal of care. Pastoral services were arranged, and her family agreed. Melissa was scheduled to be extubated later that day.  On the same day, at 03:27 p.m., respiratory therapist Paola Hernandez, R.R.T., documented that Melissa was extubated by Dr. Ortiz in the presence of a registered nurse and Melissa's family. She was placed on room air following extubation.  Melissa ultimately passed away at 03:35 p.m.

<u>c.    Death Certificate and Cause of Death</u>

42.    The death certificate indicates that Ms. De La Cruz died on April 22, 2023, in the ER/outpatient portion of the Edinburg Regional Medical Center. It also indicated that no one conducted an autopsy, and Melissa's body was cremated. The certifying physician, Juan Ortiz, listed his address as 1604 East 8th Street, Suite A, Weslaco, Texas 78596. Dr. Ortiz certified the death certificate by electronic signature on May 15, 2023. Dr. Ortiz listed as the immediate cause of death acute hypoxemic respiratory failure, and as the conditions leading to the ultimate cause of death metabolic acidosis, septic shock, and acute sepsis without septic shock (apparently listed in reverse chronological order regarding when each occurred).

<u>C.    Liability of Hidalgo County</u>

<u>1.    Introduction</u>

43.    Plaintiffs set forth in this section additional facts and allegations supporting liability claims against the County pursuant to *Monell v. Department of Social Services,* 436 U.S. 658 (1978), and other applicable law. Plaintiffs incorporate all sections of this pleading to support their liability claims based on County policies, practices, and customs. All policies, practices, and customs alleged in this pleading, individually or working together, and whether supporting episodic acts and omission or conditions of confinement claims, were moving forces behind and caused the constitutional violations and damages (including death) referenced herein. These policies, practices, and customs are pled individually and alternatively. The County knew, when it incarcerated the decedent, that its personnel, policies, practices, and customs were such that it could or would not meet constitutional obligations to protect the decedent, including but not necessarily limited to through provision of medical care. Further, consistent action and inaction by numerous County employees or agents, specifically regarding the decedent, confirm policies, practices, and customs alleged in this complaint. The County made decisions about policy and

practice that it implemented through its commissioner's court, its sheriff, its jail administrator, or through such widespread practice and custom that became the policy of the County as it related to its jail. Regardless, the Fifth Circuit Court of Appeals has made it clear that Plaintiffs need not allege the identity of chief policymaker(s) at the pleading stage.

44.    Several County policies, practices, and customs of the County were moving forces behind, caused, were producing causes of, or proximately caused the decedent's suffering and death, and other damages referenced in this pleading. The County made deliberate decisions, acting in a deliberately indifferent (applied only to episodic acts, if any, but not to alleged conditions of confinement) or objectively unreasonable manner, when implementing or allowing such policies, practices, and customs to exist. Further, when the County implemented or consciously allowed such policies, practices, and customs to exist, it knew with certainty that the result would be serious injury or illness, suffering, or death. Relevant natural persons knew that the decedent had a serious medical condition which would almost certainly result in serious injury or death. The decedent received only cursory or minimal care, ineffective treatment, or no treatment at all for this serious medical condition of which Defendant and its employees and agents had knowledge, each employee and agent drawing the inference of the likelihood of serious injury or death absent emergency medical treatment at a hospital.

### 2.    Suffering and Deaths of Other Detainees Pointing to County Policies, Practices, and Customs that Fail to Protect Detainees

45.    Other incidents of suffering and death in the County jail can show policies, practices, and customs. They can also show that the County was put on notice of the result of policies, practices, and customs and issues in its jail it needed to cure.  Since it is exceedingly rare for a plaintiff to have access to or personal knowledge of specific details regarding the existence or absence of a defendant's internal policies or training procedures before discovery, a plaintiff is

not required to allege at the pleading stage the level of detail that would be required to prove his or her claims at trial or in response to a motion for summary judgment. Discovery can weed out incidents that are not sufficiently related to the incident in this case to show policies, practices, and customs, but at the pleading stage, Plaintiffs are only required to allege enough detail to provide sufficient fair notice of the general nature and substance of Plaintiffs' allegations and further demonstrate that Plaintiffs' claims have facial plausibility. Other incidents of suffering and death further demonstrate the above enumerated and other policies, practices, and customs that, when applied individually or working together, caused, were proximate causes of, producing causes of, or were moving forces behind damages (including suffering and death) asserted in this pleading. Other incidents can show not only specific policies, practices, and customs but also can point to a pervasive carelessness for or deliberate indifference to the needs of detainees. Further, Plaintiffs expect that discovery will uncover numerous incidents which did not result in death, but which nonetheless demonstrate that the County was failing to adequately protect detainees in its jail.

46.    On April 15, 2010, Horacio Moronta died after being taken to the hospital due to medical complications. Mr. Moronta was diabetic and apparently became hypoglycemic before he was finally transferred to a hospital. His cause of death was due to sepsis with heart failure. This death put the County on notice long ago that it needed to have in place appropriate sepsis recognition and treatment protocols and policies.

47.    On July 26, 2010, yet another Hidalgo County jail detainee died after suffering sepsis with organ failure/   Richard Carper was arrested on April 23, 2010 and later began developing rashes all over his body, paired with sore lymph nodes.  He also developed a fever and swollen legs. It is not clear when Mr. Carper was taken to the hospital, where he eventually died.

48.     On August 10, 2010, Noel Ochoa died after being taken to the hospital due to falling ill while at the Hidalgo County jail. Mr. Ochoa had been diagnosed with liver cirrhosis, and his cause of death was confirmed to be caused by complications of alcohol abuse. It is unknown what if any treatment he received in the Hidalgo County jail.

49.     On July 20, 2011, Jesse Guerrero suffered multiple seizures and was restrained until EMS arrived. Restraint can complicate the effects of seizures and even cause death.  Mr. Guerrero was transported to a hospital by ambulance but had a weak pulse by the time he arrived. He was eventually pronounced deceased, and his cause of death was attributed to "delirium."  Such a purported cause of death has generally been debunked.

50.     On December 19, 2012, Ramiro Hernandez had multiple seizures caused by a cocaine overdose. Jailers became aware that Mr. Hernandez had consumed a small plastic bag of cocaine, he was transported to the hospital. Once at the hospital, Mr. Hernandez died.

51.     On June 15, 2013, Paul Labude died of heart disease while under care of a hospital. While in the jail, Mr. Labude had been treated for hypertension, but still complained of feeling ill and eventually had to be transported to the hospital, notably having a low pulse when EMS arrived to transport him. The hospital attempted to save his life by performing a cardiac catheter procedure, but Mr. Labude coded during the procedure and never recovered. It is uncertain as to how long Mr. Labude suffered with the condition causing his death, and the extent to which he received proper care and treatment while in the jail.

52.     On August 19, 2013, Armando Charles passed away in a hospital after suffering brain damage from an "accidental self-injury."  Days before, on August 14, 2013, Mr. Charles was delusional and hyperactive. He was going through alcohol withdrawal.  He was seen running around his cell before being taken to the hospital, and it is suspected that he suffered a brain injury

during this time. It is imperative that a person undergoing withdrawal from alcohol or drugs receive treatment consistent with a known withdrawal protocol.

53.     On May 25, 2014, Samuel Martinez died in the ICU following a stroke he suffered while in the jail roughly a week prior. It is unknown if Mr. Martinez entered the jail with any concerning medical conditions, or if he had any similar medical episodes prior to this since his initial arrest in October 2013.  It is also unknow whether Mr. Martinez received any treatment while incarcerated in the jail.

54.     On December 1, 2014, Juan Mendez was removed from life support after suffering severe brain injuries from a suicide attempt. Mr. Mendez has been in the Hidalgo County jail since October 10, 2014 and notably had to be re-classified and assigned new housing multiple times due to "not getting along with" and having violent thoughts towards other inmates. Despite his segregation, Mr. Mendez was provided with access to a rope, which he used as a ligature, and a towel rack, which he used as a tie-off point, to attempt to die by suicide.

55.     On July 1, 2015, Jesus Morales was pronounced brain-dead after attempting suicide in the jail the day he was arrested, June 19, 2015. A suicide screening was performed on arrival at the facility, but the custodial death report does not state the results of that screening. Regardless, Mr. Morales used his hospital gown and a handicap bar in his cell to hang himself.

56.     On June 20, 2016, Michael Herrera died of sepsis not even a month after being booked into the Hidalgo County jail. This was yet another opportunity for Hidalgo County to put into place appropriate policies regarding sepsis recognition and treatment.  During Mr. Herrera's incarceration, he was moved from general population, to a group infirmary cell, to an individual infirmary cell, and finally and apparently too late, on June 19, 2016, a hospital. Mr. Hererra had also been suffering from liver cirrhosis and kidney cancer.

57.     On October 10, 2020, Anthony Villarreal suffered two seizures while in jail, becoming agitated and disoriented after the first. This is not abnormal for a person in the postictal state. EMS was inexplicably not called until the second seizure, and he was finally taken to the hospital via ambulance. He passed away that evening due to benzodiazepine and ethanol withdrawal with heart failure. It is unknown whether the jail had in place and was using appropriate medical withdrawal protocols.

58.     On June 13, 2021, Alexandre Beltran died after undergoing emergency surgery on a brain tumor discovered just days before. He was taken to the hospital on June 11 due to persistent vomiting and seizure activity, which is when the tumor was discovered. It is unknown as to how long he had been vomiting and experiencing seizures before he was transported. The custodial death report reads that Mr. Beltran exhibited medical problems while being booked into the jail but does not specify the medical problems or any treatment plan.

59.     On August 13, 2021, Ronald Guidry was rushed to the hospital after being reported unresponsive by two other inmates. He was pronounced deceased on arrival, with his cause of death being cardiac arrest caused by Covid-19. It is uncertain as to how long he had been demonstrating symptoms and what if anything had been done medically for him in the jail.

60.     On September 28, 2021, Jorge Baez, Jr. died after a month-long battle with Covid-19. The virus developed into pneumonia and eventually caused cardiac arrest. It is unknown whether he had any treatment in the jail after his symptoms developed.

61.     On June 13, 2022, Omar Garza died after a multi-day stay at the hospital for "multiple complications." He was booked into the jail roughly a year and a half prior and was noted then to have several medical issues. His cause of death was attributed to liver cirrhosis, lung

issues, and kidney failure. However, it is unknown whether he received any treatment in the jail to assist with his suffering.

62.    On June 20, 2021, Mary Johnson was taken to the infirmary after a jailer witnessed her collapse in her cell. She had a seizure while in the jail's medical unit and was then taken to the hospital. Ms. Johnson coded in the ambulance and was pronounced deceased on arrival. It is unknown whether she had been receiving treatment for a seizure disorder or whether this was her first seizure in the jail.

63.    On September 5, 2022, Miguel Garcia passed away while in the hospital being treated for liver cirrhosis. The day prior, he was found in his cell "awake, but unresponsive" and was taken to the hospital. When booked into the county jail, he was noted to have multiple medical and mental health concerns, including, but not limited to, schizophrenia, bipolar disorder, a mass of the left thyroid gland, pneumonia, and acute kidney injury. It is unknown whether the jail was treating him for any of these issues or providing medication to lessen his pain.

64.    On January 3, 2023, Hugo Barbosa died after experiencing complications during a medical procedure being performed on his dialysis port. He had been taken to the hospital just days prior due to swelling in his feet. It is uncertain as to how long after his feet began to swell that the jail transported him to a hospital.

65.    On October 1, 2023, Jose Hernandez was found lying on his cell floor, cold to the touch. The responding jailer discovered food lodged in his throat on which Mr. Hernandez evidently had choked. It is unclear how long Mr. Hernandez had been deceased, but it was long enough that he was unable to be revived.

66.    On December 1, 2023, Jamie Mendez died after experiencing complications during a routine dialysis treatment. It is noted that Mr. Mendez had multiple medical issues and was taken

for treatment three times a week prior to his death. Information about Mr. Mendez's death and the events leading to it are sparse.

67. On February 10, 2024, Oscar Lopez passed away in the early hours while being treated at the hospital for difficulty breathing. The CDR states that Mr. Lopez coded three separate times before being pronounced deceased. His official cause of death is unknown, and it was "unknown" if he had prior medical conditions when booked into the jail. Discovery should provide further details regarding Mr. Lopez's death and events leading to it.

68. On June 24, 2024, Juan Guerra was found unresponsive in his cell by a jailer conducting observation rounds. Jailers began CPR until Mr. Guerra was taken to the hospital via ambulance. Mr. Guerra was pronounced deceased approximately one hour later, with his death attributed to hypertensive cardiovascular disease and congestive heart failure. It is unknown whether Mr. Guerra had been receiving treatment while in the jail.

### 3. TCJS Inspections and Non-Compliance Notices Demonstrate Hidalgo County's Unconstitutional Policies, Practices, and Customs

69. Texas Commission on Jail Standards ("TCJS" inspections of the Hidalgo County jail before Melissa's death indicated both notice to the County of issues in the jail and support an inference that there were preexisting policies, practices, and customs that were a moving force behind Melissa's suffering and death. TCJS reports regarding other incidents or areas of noncompliance with TCJS standards can show policies, practices, and customs, including but not limited to the policies, practices, and customs alleged below in this complaint.

70. Since it is exceedingly rare for a plaintiff to have access to or personal knowledge of specific details regarding the existence or absence of a defendant's internal policies or training procedures before discovery, a plaintiff is not required to allege at the pleading stage the level of detail that would be required to prove his or her claims at trial or in response to a motion for

summary judgment. That standard applies equally to TCJS reports regarding which Plaintiffs may obtain more information through discovery. Plaintiffs are only required to allege enough detail to provide sufficient fair notice of the general nature and substance of Plaintiffs' allegations and further demonstrate that Plaintiffs' claims have facial plausibility. TCJS reports and documents regarding County jail inspections further demonstrate enumerated and de facto policies, practices, and customs that, when applied individually or working together, caused, were proximate causes of, were producing causes of, or were moving forces behind damages (including suffering and death) asserted in this pleading. TCJS reports can show not only specific policies, practices, and customs but also can point to a pervasive carelessness for or deliberate indifference to the needs of detainees.

71.    Every time the TCJS inspected the Hidalgo County jail, the sheriff, jail administrator, and a commissioners court representative would sign a document indicating that they were aware of the inspection and results. The TCJS inspected the Hidalgo County jail from September 25-27, 2018. While reviewing mental health screening forms, an inspector determined that on occasion jailers would not complete all blanks in the form. The inspector recommended that jail administration implement a plan to ensure that jailers completed forms in their entirety.

72.    The inspector also noted, when walking through courthouse holding jails, that a jailer would use an electronic timekeeper while conducting the maximum 30-minute interval face-to-face observations. However, while the jailer would hit the timekeeper indicator, the jailer would not even turn or stop to look at detainees in a holding cell. The TCJS inspector recommended that jail administration re-train all correctional staff immediately, and further send the training roster to the inspector within 30 days.

73.     The inspector also found when reviewing face-to-face observations that jailers would at time exceed the maximum 30-minute interval. The inspector recommended that jail administration likewise address with jail employees the importance of conducting time checks at intervals no greater than those required by TCJS minimum standards. The inspector would follow up with the jail within 30 to 90 days, and if issues still existed, the TCJS would issue a notice of non-compliance.

74.     The TCJS inspected the Hidalgo County jail from September 21-23, 2020. When an inspector was reviewing medication administration records, the inspector determined that on occasion the records would not include either jail staff or detainee initials in date boxes indicating that medication required to be administered pursuant to a physician's orders was actually administered or instead refused by a detainee. The inspector thus could not verify that medications were being administered to detainees in the jail per physician orders. The inspector recommended that Hidalgo County jail administration implement a plan of action to ensure that medical staff and jailers consistently completed the medication administration form. Further, jail administration had to email the inspector a plan of action and training rosters for medical staff within the next 30 days.

75.     The TCJS inspected the Hidalgo County jail from November 8-10, 2021. As a result of the inspection, the TCJS determined that deficiencies existed. The TCJS notified the Hidalgo County jail that it was to give areas of non-compliance its serious and immediate consideration and to promptly initiating complete and appropriate corrective measures. The TCJS reminded Hidalgo County that its failure to initiating complete corrective measures following receipt of the notice of non-compliance could result in issuance of a remedial order.

76.     When reviewing medication administration records, once again, the inspector determined that on some occasions the forms did not include documentation indicating that

medication was provided to a detainee or, in the alternative, that the detainee refused the medication. Therefore, as before, the inspector was unable to determine whether medication was actually being administered in accordance with physician orders. The TCJS inspector advised Hidalgo County jail administration that, since the failure to document appropriate medication administration was a recurring issue, a plan of action had to be developed that included training and accountability for jail staff. The TCJS inspector required Hidalgo County jail administration to scan and email to the lead inspector the plan of action within the following 30 days, to include documentation that all nursing staff had completed training on how to properly document and complete the medication administration record form.

77.    The TCJS inspected the Hidalgo County jail on July 7, 2022. The TCJS determined that a detainee had been locked into a holding cell well beyond the maximum allowed 48 hours, having been detained in holding for seven days. Jail administration had to submit a plan of action to the TCJS inspector within the following 14 days to show how detainees would be transferred from holding to housing within 48 hours, as required by TCJS minimum standards. Moreover, while reviewing documentation provided by Hidalgo County jail administration, the TCJS inspector determined that the holding cell capacity of 128 inmates had been exceeded by 72 detainees on July 5, 2022. Jail administration had to submit a plan of action within the following 14 days to alleviate overcrowding in holding cells. Further, Hidalgo County Jail administration had to provide the inspector with holding cell counts every Monday for the next 30 to 90 days.

78.    As with the prior inspection, this inspection resulted in issuance of a notice of non-compliance. The TCJS once again warned Hidalgo County that, due to its deficiencies related to minimum jail standards, it was urged to give areas of non-compliance its serious and immediate consideration and to promptly initiate and complete appropriate corrective measures. Hidalgo

County was once again warned that failure to initiate and complete corrective measures after its receipt of the notice of non-compliance could result in issuance of a remedial order.

79.    The TCJS inspected the Hidalgo County jail on January 20, 2023. The TCJS, when noting documentation of face-to-face observations of detainees, that jailers lapsed both in the 30-minute maximum and 60-minute maximum jail detainee checks.

80.    The TCJS inspected the Hidalgo County jail from June 20-22, 2023. When reviewing face-to-face observation documentation, as had been a continuing problem, the documentation revealed that on several occasions detainee observations exceeded the maximum 30-minute or 60-minute requirements. The inspector impressed upon jail administration that if corrective measures did not occur, and were effective, that the TCJS might issue a notice of non-compliance. Jail administration had to provide the inspector with random observation logs every Friday for the next 30 to 90 days. Whenever the TCJS issued a notice of non-compliance to Hidalgo County, notification would occur at the TCJS website. Hidalgo County would be in the short list of jails that had been found to be non-compliant. *See* https://www.tcjs.state.tx.us/non-compliant-jails/.

4.    Hidalgo County Policies, Practices, and Customs

81.    Plaintiffs list beneath this heading the County's policies, practices, and customs which Plaintiffs allege, upon information and belief, caused, proximately caused, were producing causes of, or were moving forces behind all damages referenced in this pleading, including the decedent's death. Thus, the County is liable for all such damages. These policies, practices, and customs worked individually, or in the alternative together, to cause the decedent's death and all other damages asserted in this pleading. Plaintiffs plead conditions of confinement claims arising from policies, practices, and customs. Deliberate indifference is not an element of conditions of confinement claims.

82.     In the alternative, Plaintiffs plead episodic act or omission claims arising from policies, practices, and customs. Plaintiffs also plead that relevant actors were both deliberately indifferent and objectively unreasonable, which is relevant to the extent the Court determines that any of Plaintiffs' claims are based on episodic acts or omissions. Currently in the Fifth Circuit, courts apply the deliberate indifference standard to episodic act or omissions claims. Plaintiffs assert that the standard should not be deliberate indifference but instead should be objective unreasonableness based on controlling United States Supreme Court precedent. Regardless of which standard applies, Plaintiffs ask that the court apply the correct law to the facts pled, as required by United States Supreme Court precedent.

83.     Courts have recognized that it is exceedingly rare for a plaintiff to have access to or personal knowledge of specific details regarding the existence or absence of a defendant's internal policies or training procedures before discovery. Thus, at the pleading stage, a plaintiff is merely required to put a governmental entity on fair notice of the grounds for which it is being sued. Federal courts must rely on summary judgment to weed out unmeritorious claims. Plaintiffs thus plead the following policies, practices, and customs, which give rise to conditions of confinement claims, or in the alternative episodic act or omission claims:

**Failing to Provide Emergency or Necessary Medical Care**

- Hidalgo County failed to provide or delayed providing medical treatment to detainees.

- Hidalgo County contracted with a local physician to provide limited medical services to detainees in its jail. Despite the large number of detainees held in the Hidalgo County Jail, the agreement with a local physician required that the physician provide only six hours each week in a clinic at the jail. As is so often the case with jails, in an attempt to save money as opposed to having a licensed medical professional diagnose illnesses, Hidalgo County reached an agreement with the local physician such that the physician would provide standing delegation orders to nurse practitioners and nurses at the jail. This was an attempt to save money and

avoid transporting detainees, such as Melissa, to a local hospital even when such detainees needed medical treatment. The agreement also provided that the physician was not required to appear at the Hidalgo County jail for the minimum six hours, but instead the physician could have a nurse practitioner or physician's assistant appear for the minimum hours.

• Despite observing that detainees needed immediate emergency medical care, Hidalgo County would continue incarcerating such detainees in lieu of obtaining needed care.

• Hidalgo County failed to address observed serious health issues while monitoring detainees. This was in part an effort to save costs.

• Hidalgo County would try to save money by failing or refusing to transport detainees who vitally needed emergency medical care to a hospital.  Even when such transport was made, a county vehicle would be used at times (instead of an ambulance) to save money.

• Hidalgo County chose to have in place medical protocols for various sets of symptoms that would potentially permit jailers or medical personnel, whose licenses would not allow them to diagnose medical issues, to make diagnoses and then subsequently provide treatment. This would create confusion generally, violate state law regarding making diagnoses without a license, and ultimately, with regard to Melissa, cause days of horrific suffering and pain, and eventually death. Upon information and belief and based on all reasonable inferences from the alleged facts, these protocols were put in place to save Hidalgo County money and not to provide medical care to or constitutionally protect detainees.

• Hidalgo County had no policy and provided no training regarding recognition of sepsis in detainees and, after making such recognition, how to take appropriate actions (such as transporting a person to the emergency department of the local hospital).

• Hidalgo County may have had a custom or practice, but not a written policy, to not conduct evaluations of detainees with serious medical issues but instead simply to provide medication based upon standing orders and not based on a detainee's specific medical needs.  This would result in subtantively no medical treatment at all.

**Monitoring**

• Hidalgo County failed to monitor detainees or in the alternative failed to adequately or effectively monitor detainees.

- A study obtained by Hidalgo County regarding its jail indicated that its existing jail housed a capacity of 1,232 detainees. The incarcerated population in Hidalgo County had grown to the point that the county had to transport and house detainees in other jail facilities in the region and across Texas. The study determined in part that the Hidalgo County jail was the most crowded jail in the state with regard to TCJS requirements and detainees being housed out-of-county requiring transport to and from court, medical, and similar purposes. While Texas jails were at the time of the study at 72% capacity, the Hidalgo County jail was at 96% capacity. The project team included apparently all county commissioners, the county judge, the Hidalgo County sheriff, and a number of high-level personnel at the Hidalgo County Sheriff's Office.  Detainees suffered as a result of the overcrowding by, in part, not receiving medical treatment.

- Hidalgo County, in the alternative, while monitoring detainees, failed to take action based upon material information obtained during such monitoring regarding serious health issues. This was due in part, as may be true with other potential policies, practices, and/or customs, to attempt to save costs.

**Communication**

- Hidalgo County did not communicate a detainee's serious medical needs from one shift to another through appropriate pass-down notes, logs, or meetings.

**Training**

- Hidalgo County did not train jailers as to how to deal with seriously ill detainees.

**Other Evidence of Policies, Practices, and Customs**

- When a policymaker knows about misconduct and fails to take remedial action, such inaction can support a finding that the policymaker acquiesced in the misconduct representing official policy, practice, or custom. Hidalgo County failed to reprimand or take remedial action against employees or agents as a result of action or inaction related to the decedent's suffering and death, thus confirming that the policies, practices, and customs that led to the decedent's suffering and death were in fact *de facto* policies of Hidalgo County.

- Consistent testimony or behavior of jail employees can also support a finding of official policy, practice, or custom. Hidalgo County employees acted consistently in their actions or inaction related to Melissa's suffering

and death, thus confirming that the policies, practices, and customs that led to Melissa's suffering and death were in fact *de facto* policies of Hidalgo County.

- The Hidalgo County Jail had serious overcrowding issues for years. An August 15, 2018 article quoted Sheriff Eddie Guerra. Sheriff Guerra said that 200 Hidalgo County detainees were being held in other jails including those in Brooks County, Karnes County, Starr County, and Jim Hogg County. A September 9, 2022, article confirmed that the overcrowding situation continued. Sheriff Guerra said that the Hidalgo County Adult Detention Center was at maximum capacity. He further said, "My staff has actually no room to breathe." Moreover, "I mean, you've got maintenance issues, so you got to move and vacate pods and cells, but we don't have that luxury right now." The overcrowding issue had expanded at that point, Hidalgo County sending 460 detainees to other counties such as Brooks County, Jim Hogg County, and Starr County. In July 2024, Hidalgo County began transferring detainees to the Willacy County Regional Detention Center. It would eventually hold 450 detainees. The overcrowding problem had gone on for many years.  The issue could have been resolved over 20 years ago, if the Hidalgo County Commissioner's Court and then-County Judge Eloy Pulido had funded a 2,000 bed facility instead of the 1,232 bed facility. The 1,232 bed facility, completed in 2003, reached capacity only 10 weeks after it opened. Hidalgo County Judge Richard Cortez likewise indicated in March 2025 that the Hidalgo County Jail was still at capacity.

III.     Causes of Action

  A.     Remedies for Violation of Constitutional Rights

84.     The United States Court of Appeals for the Fifth Circuit has held that using a state's wrongful death and survival statutes creates an effective **remedy** for civil rights claims pursuant to 42 U.S.C. § 1983. Therefore, for causes of action asserted in this complaint, Plaintiffs seek all **remedies and damages** available pursuant to Texas and federal law, including but not necessarily limited to the Texas wrongful death statute (Tex. Civ. Prac. & Rem. Code § 71.002 *et seq.*), the Texas survival statute (Tex. Civ. Prac. & Rem. Code § 71.021), the Texas Constitution, common law, and all related or supporting case law. If the decedent had lived, he would have been entitled to bring a 42 U.S.C. § 1983 action for violation of the United States Constitution and obtain

**remedies and damages** provided by Texas and federal law. Plaintiffs incorporate this **remedies** section into all sections in this complaint asserting causes of action. However, if at the relevant time remedies provided by Texas law are insufficient to compensate Plaintiffs, Wrongful Death Beneficiaries, and Claimant Heirs for all damages they suffered as a result of incidents referenced in this complaint, or such remedies frustrate the intent of Congress in providing remedies for claims for violations of the United States Constitution, brought pursuant to 42 U.S.C. § 1983, then Plaintiffs, Wrongful Death Beneficiaries, and Claimant Heirs should be provided **all available remedies** even if such remedies are not provided by or under Texas law.

B.    Cause of Action Against Hidalgo County Under 42 U.S.C. § 1983 for Violation of Constitutional Rights

85.    In the alternative, without waiving any other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Defendant Hidalgo County is liable to Plaintiffs, Wrongful Death Beneficiaries, and Claimant Heirs, pursuant to 42 U.S.C. § 1983, for violating the decedent's constitutional rights including but not necessarily limited to those to receive reasonable medical and mental healthcare, to be protected, and not to be punished as a pretrial detainee. These rights are guaranteed by at least the Fourteenth Amendment to the United States Constitution. Pretrial detainees are entitled to be protected and not to be punished at all, since they have not been convicted of any alleged crime resulting in their incarceration. Regardless, Plaintiffs rely on the Court to apply the correct constitutional guarantees to the facts pled as required by United States Supreme Court precedent.

86.    The County's employees and agents acted or failed to act under color of state law at all relevant times. The County's policies, practices, and customs were moving forces behind and

caused, were producing causes of, or were proximate causes of the decedent's suffering, damages, and death, and all damages suffered by Plaintiffs, Wrongful Death Beneficiaries, and Claimant Heirs.

87.     The Fifth Circuit Court of Appeals has made it clear that Plaintiffs need not allege the appropriate chief policymaker at the pleadings stage. Nevertheless, out of an abundance of caution, the County sheriff was the County's relevant chief policymaker over matters at issue in this case. Moreover, in addition, and in the alternative, the County's jail administrator was the relevant chief policymaker over matters at issue in this case. Finally, and in the alternative, the County's commissioners' court was the relevant chief policymaker.

88.     The County was deliberately indifferent regarding policies, practices, and customs developed or used related to issues addressed by allegations set forth above, for any facts which are ultimately determined to support episodic act or omission claims, to the extent deliberate indifference is a necessary element or prerequisite to such claims at the time the Court makes that determination. Deliberate indifference is not an element of a conditions of confinement claim. The County also acted in an objectively unreasonable manner. Policies, practices, and customs referenced above, as well as the failure to adopt appropriate policies, were moving forces behind and caused violation of the decedent's rights and showed deliberate indifference to the known or obvious consequences that constitutional violations would occur. Once again, by including the "deliberate indifference" allegation, Plaintiffs are not conceding or alleging that deliberate indifference is a necessary element of a conditions of confinement claim. It is not. The County's relevant policies, practices, and customs, whether written or not, were also objectively unreasonable as applied to the decedent.

89.    Therefore, the decedent's estate and her heirs at law (Claimant Heirs) suffered the following damages, for which they seek recovery, through the estate administrator, from the County:

- the decedent's conscious physical pain, suffering, and mental anguish;

- the decedent's loss of life and/or loss of enjoyment of life;

- the decedent's medical expenses; and

- the decedent's funeral expenses.

90.    Araceli De La Cruz, individually, seeks all remedies and damages available to her as a Wrongful Death Beneficiary. Ashlee Gonzalez, individually and as estate administrator asserting claims on behalf of Wrongful Death Beneficiaries, also seeks recovery from the County for all remedies and damages available to each Wrongful Death Beneficiary individually for claims asserted in this pleading. The County's policies, practices, and customs caused, were proximate causes of, producing causes of, and/or moving forces behind and caused the following damages suffered by these people, for which each individually seeks compensation, whether as a party to this case or through another party asserting claims for such relief in some representative or other legally appropriate capacity:

- past mental anguish and emotional distress suffered by each resulting from and caused by the decedent's death;

- future mental anguish and emotional distress suffered by each resulting from and caused by the decedent's death;

- loss of companionship and society, as applicable, that each would have received from the decedent; and

- loss of household services, as appropriate, excluding any monetary payments of any type or category made by decedent to a Wrongful Death Beneficiary.

Moreover, Plaintiffs seek reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

IV.    Concluding Allegations and Prayer

    A.    Conditions Precedent

91.    All conditions precedent to assertion of all claims herein have occurred.

    B.    Use of Documents at Trial or Pretrial Proceedings

92.    Plaintiffs intend to use at one or more pretrial proceedings and at trial all documents produced by Defendant in this case in response to written discovery requests, with initial disclosures (and any supplements or amendments to same), and in response to Public Information Act request(s).

    C.    Jury Demand

93.    Plaintiffs demand a jury trial on all issues which may be tried to a jury.

    D.    Prayer

94.    For these reasons, Plaintiffs ask that Defendant be summoned to appear and answer, and that Plaintiffs, Wrongful Death Beneficiaries, and Claimant Heirs have judgment for damages within the jurisdictional limits of the court and against Defendant for all damages referenced above and below in this pleading:

    a)    actual damages and including but not necessarily limited to for:

- the decedent's medical expenses;

- the decedent's funeral expenses;

- past mental anguish and emotional distress suffered by each Wrongful Death Beneficiary resulting from and caused by the decedent's death;

- future mental anguish and emotional distress suffered by each Wrongful Death Beneficiary resulting from and caused by the decedent's death;

- loss of companionship, loss of society or both, as appropriate, with the decedent suffered by each Wrongful Death Beneficiary resulting from and caused by the decedent's death;

- the decedent's conscious physical pain, suffering, and mental health anguish;

- the decedent's loss of life and loss of enjoyment of life; and

- loss of household services, as appropriate, excluding any monetary payments of any type or category made by decedent to a Wrongful Death Beneficiary;

b)     reasonable and necessary attorneys' fees through trial and any appeals and other appellate proceedings, pursuant to 42 U.S.C. §§ 1983 and 1988;

c)     court costs and all other recoverable costs;

d)     prejudgment and postjudgment interest at the highest allowable rates; and

e)     all other relief, legal and equitable, general and special, to which Plaintiffs, Wrongful Death Beneficiaries, and Claimant Heirs are entitled.

Respectfully submitted:

Law Offices of Dean Malone, P.C.

  /s/ T. Dean Malone
T. Dean Malone

T. Dean Malone
Attorney-in-charge
dean@deanmalone.com
Texas State Bar No. 24003265
Southern District of Texas Bar No. 37893
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone: (214) 670-9989
Telefax:   (214) 670-9904

Of Counsel:

Michael T. O'Connor
Texas State Bar No. 24032922
Southern District of Texas Bar No. 37991
michael.oconnor@deanmalone.com
Jennifer Kingaard
Texas State Bar No. 24048593
Southern District of Texas Bar No. 589455
jennifer.kingaard@deanmalone.com
Alexandra W. Payne
Texas State Bar No. 24118939
Southern District of Texas Bar No. 3799983
alexandra.payne@deanmalone.com
Jessica Bebawi
Texas State Bar No. 24108867
Southern District of Texas Bar No. 3886075
jessica.bebawi@deanmalone.com
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone:    (214) 670-9989
Telefax:    (214) 670-9904

Attorneys for Plaintiffs